IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRAD SNYDER, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, <br><br> Defendant. | Civil Action No. 1:23-cv-00731-CKK |

## DECLARATION OF REBECCA CALCAGNO

I, Rebecca Calcagno, hereby declare as follows:

1. I currently serve as Program Manager of the Special Access and Freedom of Information Act Program ("Special Access") of the National Archives and Records Administration ("NARA"). I have held this position since 2021. Prior to this position, I was an Archivist in Special Access from 2015 to 2017 and a Supervisory Archivist from 2017 until 2021. I have worked as an Archivist at NARA since 2012.

2. I hold a Master of Arts in Shakespearean Studies from King's College, London; a Master of Arts, Master of Philosophy, and Doctor of Philosophy in English and Comparative Literature from Columbia University; and a Master of Library Science from the University of Maryland.

3. In my current position as the Program Manager of the Special Access and FOIA Program, I supervise a total of four Supervisory Archivists, 24 Archivists, three Archives Specialists, and one Government Information Specialist whose responsibilities are focused on providing access—either through Special Access requests or through FOIA—to hundreds

-1-

of thousands of pages of archival records. Each Archivist on my staff holds at least a Bachelor's degree in History, Archival Science, or a related subject matter, and over time has become very familiar with the subject matter of the collections to which access is sought.

4. Due to the nature of my official duties, I am familiar with the procedures followed by NARA in responding to requests for material from its archival collection pursuant to the provisions of the FOIA, 5 U.S.C. § 552. I am also specifically aware of the handling of Plaintiff's FOIA request that is the subject of this litigation.

5. In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), I provide this declaration in support of NARA's motion for summary judgment and to provide justifications for the withholding of information responsive to plaintiff's request pursuant to FOIA Exemption 7(D). Plaintiff has not contested the adequacy of Defendant's search.

6. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

**ADMINISTRATIVE HISTORY OF PLAINTIFF'S FOIA REQUEST**

7. By letter dated May 26, 2022, Brad Snyder submitted a FOIA request to Special Access seeking "any records in the Bureau's files pertaining to Angelo Herndon, also known as Eugene Braxton and Gene Braxton." *See* **Exhibit A**.

8. By letter dated May 27, 2022, NARA acknowledged Dr. Snyder's FOIA request, and by letter dated May 31, 2022, NARA notified Dr. Snyder that it had assigned his FOIA request tracking number RD 67586. *See* **Exhibits C and D.**

9. On November 21, 2022, NARA notified Dr. Snyder that it located three FBI case files containing responsive records: (1) 100-CG-18143, a domestic security investigation; (2)

61-HQ-7259, a treason investigation; and (3)100-WFO-47734, a domestic security investigation. *See* **Exhibit E.**

10. By letter dated February 27, 2023, Dr. Snyder requested that NARA process his request on an expedited basis so that he could meet a publishing deadline. *See* **Exhibit F.** In addition, Snyder argued that the records were unlikely to require redactions, considering their age, and asserted that a "delay in processing the records could derail [an] important project." *See id.* The request was forwarded to Special Access on March 10, 2023.

11. By email dated March 10, 2023, Dr. Snyder amended his request for expedited processing, after NARA informed him that his original request failed to state a basis for expedition under NARA's FOIA regulations. *See* **Exhibit G.**

12. By letter dated March 17, 2023, NARA notified Dr. Snyder that it was denying his request for expedited processing. *See* **Exhibit H**. That same day, Plaintiff filed the instant lawsuit, seeking an order compelling NARA to respond to his FOIA request on an expedited basis.

13. By letter dated May 10, 2023, Dr. Snyder appealed NARA's denial of his request for expedited processing. *See* **Exhibit I**.

14. NARA sent Plaintiff a final response to his FOIA request and responsive records on May 31, 2023. *See* **Exhibit J**. The final response letter stated that NARA had released 467 pages in full and that it was releasing 160 pages in part and withholding one page in full, under FOIA exemptions (b)(7)(D) and (b)(7)(E). *See id.*

15. By letter dated June 16, 2023, Dr. Snyder appealed NARA's response to his FOIA request, arguing that the identities of certain confidential sources are not protected under exemption (7)(D) because the informants are deceased. *See* **Exhibit K** at 3. The appeal

challenges 24 redactions of confidential informants' identities, all located within 61-HQ-7259.

16. By letter dated July 26, 2023, NARA notified Dr. Snyder that it was denying his administrative appeals as moot, since his request is in litigation. *See* **Exhibit L.**

## THE NATIONAL ARCHIVES AND ITS HOLDINGS

17. The National Archives was established in 1934 by President Franklin Roosevelt to preserve and care for the records of the U.S. Government, but its major holdings date back to 1775. They capture the sweep of the past: slave ship manifests and the Emancipation Proclamation; captured German records and the Japanese surrender documents from World War II; journals of polar expeditions and photographs of Dust Bowl farmers; Indian treaties making transitory promises; and a richly bound document bearing the bold signature "Bonaparte" — the Louisiana Purchase Treaty that doubled the territory of the young republic.

18. In 1985, the National Archives became an independent executive agency, and it now has over 40 facilities nationwide including field archives, Federal Records Centers, Presidential Libraries, the *Federal Register*, and the National Historical Publications and Records Commission. NARA keeps only those federal records that are judged to have continuing value — about two to five percent of those generated in any given year. By now, they add up to a formidable number, diverse in form as well as in content. There are over 13 billion pages of textual records; 10 million maps, charts, and architectural and engineering drawings; 41 million still photographs and graphics; 40 million aerial images; 562,000 reels of motion picture film; 545,000 video and sound recordings; and 837 terabytes of electronic

data. All of these materials are preserved because they are important to the workings of Government, have long-term research worth, or provide information of value to citizens.[1]

19.     Among its many holdings, NARA maintains custody of the permanently valuable records of the Federal Bureau of Investigation (FBI) which have been transferred into our legal custody, including the files requested in the case.

20.     Staff in Special Access have extensive experience with the records of the FBI, as the vast majority of the FOIA requests we handle are for restricted FBI records. As staff have extensive experience with law enforcement records, they also have extensive experience with FOIA Exemption 7(D). All staff receive training on Exemption 7(D).

**JUSTIFICATION FOR APPLICATION OF FOIA EXEMPTION 7(D)**

21.     NARA processed all records responsive to Plaintiff's FOIA request to achieve maximum disclosure, consistent with the access provisions of the FOIA. NARA considered the foreseeable harm standard when applying Exemption 7(D), and every effort was made to provide Plaintiff with all reasonably segregable, non-exempt information.

EXEMPTION 7 THRESHOLD

22.     Exemption 7 protects six different categories of law enforcement information from disclosure. See 5 U.S.C. § 552(b)(7). To qualify under any of the categories, the information at issue must first meet a threshold requirement: that it was "compiled for law enforcement purposes [.]" *Id.*

23.     Under 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and

---

[1] *See* http://www.archives.gov/publications/general-info-leaflets/1-about-archives.html.

responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to the national security, and to further the foreign intelligence objectives of the United States.

24. Under this investigative authority, the responsive records at issue were compiled in furtherance of the FBI's criminal law enforcement investigations of Angelo Herndon. Considering the fact that these records were compiled as part of the investigation of potential crimes and threats to national security, NARA properly determined that they were compiled for law enforcement purposes.

## EXEMPTION 7(D) ENUMERATED HARM

25. In addition to showing that a file was compiled for law enforcement purposes, an agency invoking Exemption 7 must demonstrate one of the enumerated harms protected by the exemption.

26. Plaintiff is challenging 24 redactions, all of which shield the identities of confidential FBI informants, under FOIA Exemption 7(D). *See* Joint Status Report, ECF No. 9, ¶ 3; Ex. K at 3.

27. FOIA Exemption 7(D) protects records or information compiled for law enforcement purposes when disclosure:

> could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

28. The purposes of Exemption 7(D) are "to assist federal law enforcement agencies to obtain, and to maintain, confidential sources, as well as to guard the flow of information to these agencies." *Parker v. Dep't of Justice*, 934 F.2d 375, 380 (D.C. Cir. 1991).

29. "[A]n agency invoking Exemption 7(D) must show that the source acted under an express or implied grant of confidentiality." *Kendrick v. Fed. Bureau Investigation*, No. 20-cv-2900, 2022 U.S. Dist. LEXIS 175454, *17 (D.D.C. Sep. 28, 2022). To rely on an express promise of confidential treatment, an agency must provide "evidence that the source did in fact receive an express grant of confidentiality." *Campbell v. Dep't of Justice*, 164 F.3d 20, 34 (D.C. Cir. 1998)(citation and internal quotation marks omitted). "Such evidence can take a wide variety of forms, including notations on the face of a withheld document [.]" *Id.*

30. It is well-established that express assurances of confidential treatment can be established through markings on the face of documents, including the use of source codes to denote the identity of a confidential informant. *See, e.g., Roth v. Dep't of Justice*, 642 F.3d 1161, 1185 (D.C. Cir. 2011)(holding that the FBI properly relied on the presence of informant source codes to establish that it gave express informants grants of confidentiality for purposes of exemption 7(D)); *Mays v. Drug Enforcement Agency*, 234 F.3d 1324, 1328-9 (D.C. Cir. 2000)(holding that the DEA was entitled to summary judgment regarding FOIA Exemption 7(D) where the DEA relied on an informant source code to establish that it had made an express grant of confidentiality); *Callimachi v. Fed. Bureau Investigation*, 583 F. Supp. 3d 70, 88-89 (D.D.C. 2022)(holding that the FBI's reliance on source codes was sufficient to demonstrate that the agency provided express assurances of confidentiality to informants for purposes of Exemption 7(D) and collecting cases in which D.C. Circuit judges "upheld similar explanations by the FBI on source symbol numbers."). *See also, Department of Justice Guide to the Freedom of*

*Information Act Exemption 7(D)* 608-610, n. 45 (posted September 9, 2022) (collecting cases in which courts held that notations on the face of documents, including symbols used to denote confidential sources, demonstrated that the FBI provided express promises of confidential treatment for purposes of FOIA Exemption 7(D)), *available at* https://www.justice.gov/media/1057196/dl?inline.

31. NARA was able to determine that the FBI provided express assurances of confidential treatment to each of the confidential sources whose identities are protected by the 24 redactions challenged by Plaintiff, because for all sixteen pages of redactions, NARA located alphanumeric source codes used to denote the identity of a confidential informant. *See* **Exhibit M**, *Vaughn* Index.

32. For many of the 24 redactions at issue, the documents contained notations that, in addition to the use of a confidential alphanumeric source code, gave further indications that the FBI gave the informant express assurances of confidentiality. These notations include, for example, the words "Confidential Informant," the letters "C.I.", and the abbreviation "CONF. INFT." *See id.*

REASONABLY FORESEEABLE HARM

33. In addition to finding that the FBI provided express promises of confidential treatment, NARA determined that release of confidential source symbol codes could reasonably be expected to harm an interest protected by the exemption, consistent with the "foreseeable harm standard" established by the FOIA Improvement Act of 2016.

34. If NARA disclosed the confidential source symbol numbers of these informants, their identities could be ascertained by persons knowledgeable of the FBI's investigations and

the events and subjects involved because these singular alphanumeric codes are assigned to specific individuals.

35. "Revealing a source's identity or provided information would weaken the FBI's ability to credibly promise confidentiality to future sources." *Callimachi*, 583 F. Supp. 3d. at 89. Disclosure of the confidential source codes can reasonably be expected to harm the FBI's intelligence gathering operations, which depend on sources' willingness to furnish information to the Bureau—a willingness that is contingent upon the credibility of the FBI's promises to afford confidential treatment to people who would face threats of violence and other forms of reprisal if their identities were revealed. "The FBI needs [its] ability to "recruit and maintain the cooperation of confidential sources," but "those sources would balk if they knew that the FBI might disclose their information, even years later." *Id.* (cleaned up). Such a result would undermine one of the FBI's most important means of collecting information and could thereby severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal law.

36. There is a particularly high risk of a chilling effect arising from disclosure of the informants at issue here, where Plaintiff intends to use this information in a biography of Angelo Herndon, which is under publishing contract and intended to reach wide audiences. If the identities of the confidential sources at issue are disclosed through the biography, possible informants would become aware of the FBI's failure to uphold express promises to maintain the confidentiality of its sources, weakening the credibility of such assurances.

37. Thus, release of the information would have a lasting negative impact on the FBI's information program as it would greatly hinder the FBI's ability to recruit and maintain

confidential human sources willing to provide accurate and relevant information pertaining to criminal activities.

38. The disclosure of a source's identity could also endanger the emotional and physical wellbeing of the source or the source's family or associates, and subject them to public ridicule and ostracism.

39. In his appeal, Dr. Snyder argued that he has "grave doubts" that NARA can demonstrate harm to an interest protected by the FOIA because the informants at issue are all deceased. **Exhibit K** at 3. Courts in this jurisdiction have rejected this exact argument. *See, e.g.*, *Blanton v. Dep't of Justice*, 64 Fed. Appx. 787, 790 (D.C. Cir. 2003)(affirming lower court's rejection of the argument that " the death of a confidential source eliminates the applicability of Exemption 7(D)"); *Campbell*, 164 F.3d at 33 n. 14 (observing that the "[d]eath of a confidential source . . . is not relevant under exemption 7(D)"); *Bullock v. Fed. Bureau Investigation*, 577 F. Supp. 2d 75, 80 (D.D.C. 2008)(holding that "plaintiff's claim that the confidential source is deceased is irrelevant, as Exemption 7(D) continues to apply after the death of a confidential source").

40. Plaintiff's belief that Exemption 7(D) does not survive the death of an informant apparently arises from his overly narrow view of the interests protected by the exemption. The interests protected by Exemption 7(D) extend beyond the physical safety of an informant and include the credibility of the FBI's promises of confidential treatment, the Bureau's ability to attract and use confidential informants in its intelligence gathering efforts in the future, and the possibility of harm to the source's surviving family and associates. These are precisely the interests that NARA considered when applying Exemption 7(D) to the 24 redactions at issue.

41. Plaintiff's appeal also stressed the public interest in the nature of the withheld information. **Exhibit K** at 3. Such considerations are not relevant for purposes of Exemption 7(D), however, as there is no balancing test for the exemption. *See Roth v. Dep't of Justice*, 642 F.3d at 1184. "If the [agency]'s production of criminal investigative records could reasonably be expected to disclose the identity of a confidential source or information furnished by such a source, that ends the matter, and the agency is entitled to withhold the records under Exemption 7(D)." *Id.* at 1184-1185 (cleaned up). This is because the harm arising from the disclosure of a confidential source's identity is "self-evident." *See* 583 F. Supp. 3d at 89 (internal quotation marks omitted).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through M are true and correct copies of the originals.

Executed this 12th day of October, 2023.

*RACalcagno*

Rebecca Calcagno
Program Manager, Special Access and FOIA Program
Research Services Division
National Archives and Records Administration
College Park, Maryland