**Exhibit** Case 1:23-cv-00731-CKK   Document 14-9   Filed 10/17/23   Page 1 of 27

5/10/23, 10:38 AM          National Archives & Records Administration Mail - Brad Snyder's Appeal of NARA decision RD 67586 re: Records of Mr. Angelo ...

 NATIONAL
ARCHIVES

Amanda Weimer <amanda.weimer@nara.gov>

## Brad Snyder's Appeal of NARA decision RD 67586 re: Records of Mr. Angelo Herndon

1 message

Brad Snyder <Brad.Snyder@law.georgetown.edu>                          Wed, May 10, 2023 at 10:35 AM
To: debra.wall@nara.gov, garymstern@nara.gov, Amanda.Weimer@nara.gov

In an effort to avoid protracted litigation in federal court, I have appealed NARA's initial decision not to expedite its review of the FBI Records of Mr. Angelo Herndon in RD 67586. I urge NARA to review the 650 pages of records within the next six months because I would like to include the FBI's seven-decade surveillance of Mr. Herndon as a "treason" risk and a "security risk" in the book about Herndon I am writing for W.W. Norton. Two respected journalists, including a two-time Pulitzer Prize winner who covers the FBI for the New York Times, disagree with NARA's initial decision that Herndon's FBI file is not "newsworthy." Attached is a copy of my electronic submission. Please let me know if you have any questions. Thanks in advance for your consideration.

Best,

Brad Snyder

📄 Snyder NARA submission 5 9 23.pdf
832K

Case 1:23-cv-00731-CKK   Document 14-9   Filed 10/17/23   Page 2 of 27

5/10/23, 1:42 PM          National Archives & Records Administration Mail - Brad Snyder's Appeal of NARA decision RD 67586 re: Records of Mr. Angelo H...

 NATIONAL
ARCHIVES

Amanda Weimer <amanda.weimer@nara.gov>

## Brad Snyder's Appeal of NARA decision RD 67586 re: Records of Mr. Angelo Herndon

**Hannah Bergman** <Hannah.Bergman@nara.gov>                                    Wed, May 10, 2023 at 1:30 PM
To: Gary Stern <garym.stern@nara.gov>
Cc: Amanda Weimer <amanda.weimer@nara.gov>

Hi Amanda,

I would not respond. I will let the AUSA know this came in. Brad Snyder's attorney, David Vladeck, emailed back and forth
with the AUSA yesterday and from the emails it is clear he doesn't understand the litigation process. Vladeck was a bit
rude to DOJ in the email so that doesn't bode well.

I just emailed Becky this morning to ask if you all were still on track to complete the review by the end of May and if there
were classified records, would you be able to do a partial release while those were on consult, or not. As soon as I get the
updated information there, I'll get back to DOJ, so they can get back to Snyder and his attorney.

Hannah

On Wed, May 10, 2023 at 1:17 PM Gary Stern <garym.stern@nara.gov> wrote:
  I'm cc'ing Hannah, who can answer this question.

  Gary M. Stern
  General Counsel
  National Archives and Records Administration
  8601 Adelphi Road
  College Park, MD  20740
  240-475-2816 (cell)
  301-837-3026 (office)
  301-837-0293 (fax)
  garym.stern@nara.gov

   NATIONAL
  ARCHIVES

  🇫 🔘 🔘 🔘 🔘

  On Wed, May 10, 2023 at 1:15 PM Amanda Weimer <amanda.weimer@nara.gov> wrote:
    Hi, Gary--

    The file is undergoing review in response to his litigation and we expect it to be complete on the schedule we have
    already relayed via Becky. Am I required to send a separate response to Prof. Snyder on this item?

    This email is UNCLASSIFIED.

    Dr. A. M. Weimer
    Supervisory Archivist
    Special Access and FOIA Program (RF)
    (pronouns: they/them, she/her)
    National Archives and Records Administration
    8601 Adelphi Road, Room 5510
    College Park, MD 20740-6001

Case 1:23-cv-00731-CKK   Document 14-9   Filed 10/17/23   Page 3 of 27

5/10/23, 1:42 PM                National Archives & Records Administration Mail - Brad Snyder's Appeal of NARA decision RD 67586 re: Records of Mr. Angelo H…

Amanda.Weimer@nara.gov
(301) 837-0604
https://www.archives.gov/research/foia



NATIONAL
ARCHIVES

---------- Forwarded message ---------
From: **Brad Snyder** <Brad.Snyder@law.georgetown.edu>
Date: Wed, May 10, 2023 at 10:37 AM
Subject: Brad Snyder's Appeal of NARA decision RD 67586 re: Records of Mr. Angelo Herndon
To: <debra.wall@nara.gov>, <garymstern@nara.gov>, <Amanda.Weimer@nara.gov>

In an effort to avoid protracted litigation in federal court, I have appealed NARA's initial decision not to expedite its review of the FBI Records of Mr. Angelo Herndon in RD 67586. I urge NARA to review the 650 pages of records within the next six months because I would like to include the FBI's seven-decade surveillance of Mr. Herndon as a "treason" risk and a "security risk" in the book about Herndon I am writing for W.W. Norton. Two respected journalists, including a two-time Pulitzer Prize winner who covers the FBI for the New York Times, disagree with NARA's initial decision that Herndon's FBI file is not "newsworthy." Attached is a copy of my electronic submission. Please let me know if you have any questions. Thanks in advance for your consideration.

Best,

Brad Snyder



## GEORGETOWN LAW

**Brad Snyder**
**Anne Fleming Professor of Law**

May 9, 2023

*By Email and U.S. Mail*

Ms. Debra Steidel Wall
Deputy Archivist, and Acting Archivist of the United States
National Archives and Records Administration
8601 Adelphi Road, Room 4200
College Park, Maryland 20740-6001

> Re: *Appeal by Brad Snyder Seeking Records of Mr. Angelo Herndon*
> *(RD 67586)*

Dear Archivist Wall:

I am the Anne Fleming Research Professor of Law at Georgetown University Law Center, and I am in the midst of writing a biography of Mr. Angelo Herndon, a leading figure in Black history. Although I teach full-time at Georgetown Law, I am also a legal historian and the author of several books focused on the intersection of law and public policy. I recently published *Democratic Justice: Felix Frankfurter, the Supreme Court, and the Making of the Liberal Establishment* (W.W. Norton, 2022), and *The House of Truth: A Washington Political Salon and the Founding of American Liberalism* (Oxford University Press, 2017). Perhaps my most famous book is *A Well-Paid Slave: Curt Flood and the Fight for Free Agency in Professional Sports* (Viking/Penguin, 2006).

I write to appeal NARA's initial decision, rendered on March 17, 2023, by Dr. A. M. Weimer, Supervisory Archivist, denying my request to expedite NARA's processing of 650 pages of Federal Bureau of Investigation files relating to Mr. Herndon. NARA claims that it will take 39 months to process those papers. I have a contract to write Mr. Herndon's biography, but given NARA's delay in processing, I will not obtain the FBI records until well after the contract's publication date. This appeal is timely because this administrative appeal is submitted well within the 90 calendar days set out in Dr. Weimer's March 17th ruling.

### Background

I decided to write a biography of Mr. Herndon not only because he is a leading figure in Black history – a subject long ignored by the mainstream press – but also a key figure in the fight for First Amendment protection for those who protest against the government. The Supreme Court's path-breaking decision in *Herndon v. Lowry*, 301 U.S. 441 (1937), is as important today as it was nearly a century ago. An all-white Georgia jury convicted Herndon of attempting to incite an insurrection; the Judge sentenced Herndon to eighteen to twenty years on a chain gang. In fact, Mr. Herndon led a peaceful demonstration by hundreds of Black and white unemployed workers seeking to restore unemployment benefits to thousands of out of workers. In a landmark decision, the Supreme Court overturned Mr. Herndon's conviction and invalidated Georgia's incitement law under the First Amendment. The Court ruled "[t]he power of a state to abridge freedom of speech and of assembly is the exception rather than the rule and the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government." The Court added that, "in the case at hand, the Georgia court had construed the statute in such a 'vague and indefinite' way."

I knew that Mr. Herndon was likely a subject of interest to the Federal Bureau of Investigation ("FBI"). I asked my lawyer to file a Freedom of Information Act ("FOIA") request for FBI records relating to Mr. Herndon. He did so by letter dated May 11, 2022. The FBI searched for records, but instead of processing the records and disclosing them to me, the FBI sent the records to the National Archives and Record Administration ("NARA") sometime before July 19, 2022. The FBI's letter to my counsel was dated July 19, 2022, and said that records "responsive to your request were sent to the National Archives and Records Administration." Although the FBI sent the records in July, NARA asserts that it took to November 2022 to complete its "search," notwithstanding the fact that the only records NARA identified appear to be the FBI files transmitted to NARA by the FBI in July 2022.

### NARA's Response

On November 21, NARA responded to me by email, acknowledging the receipt of the FBI records, but stating that NARA would need an additional 39 months to "process" the records. According to NARA, there are about 650 pages of records on the FBI's surveillance of Mr. Herndon: (1) records relating to the FBI's "security investigation" from 1934 through 1990, which amount to an estimated 400 pages; (2) records relating to an overlapping "treason investigation" "created between 1934 and 1974," consisting of 250 pages; and (3) 4 pages "compiled as part of a Washington, D.C., field office created between April and July 1968." NARA said that it would take approximately 39 *additional* months to process the records, notwithstanding the age of the records and the certainty that disclosure could not lead to foreseeable harm. 5 U.S.C. § 552(a)(8)(A)(i).

I sought expedition because I believe that NARA should process and disclose the FBI Herndon files records now, not next year, and certainly not in nearly four years. By that time, I will have published my book, and the key account of the FBI's fifty-eight-year surveillance of Mr. Herndon will be missing.

I now seek reconsideration. NARA's initial decision wrongly concludes that publication of the details of the FBI's marathon surveillance of Mr. Herndon is unlikely to be "newsworthy." In my view, and in the view of highly respected reporters, Dr. Weimer erred for two reasons -- one is that the release of the Herndon FBI files would certainly be "newsworthy." The other reason is that the release of the Herndon files would almost certainly demonstrate FBI wrongdoing -- after all, there can be no doubt that fifty-eight years of unbroken FBI surveillance violated Mr. Herndon's First and Fourth Amendment rights. NARA's fourth criteria for expedition embraces the idea that NARA should not be in the business of hiding government wrongdoing. This is a textbook case for expedition, and NARA should process and release the records forthwith.

### Why NARA Rules Mandate Expedition

There are several reasons why NARA should expedite processing. First, the decision by Dr. Weimer denying my request for expedition is nothing more than a self-fulfilling prophecy. Dr. Weimer's key conclusion was that there is not significant media interest in the history of Black activists like Mr. Herndon to make the release of the Herndon FBI records "newsworthy." To assess media interest, Dr. Weimer conducted a survey of media outlets over the past decade to see whether they mentioned Mr. Herndon. She concluded "I do not believe that your request for records on Angelo Herndon meets the 'widespread and exceptional' [public interest] prong of criteria 4."

With all respect, I disagree with Dr. Weimer. Dr. Weimer reached the wrong conclusion because she asked the wrong question. The question she pursued was whether news stories over the past decade featured Mr. Herndon. Given the scarce media coverage of Black activism and activists, and the government's reticence to acknowledge its surveillance of Black activists, it is unsurprising that there was little media coverage of Mr. Herndon over the past ten years.[1]

The right question to ask is whether there would be "widespread and exceptional" public interest if NARA made public the facts relating to the FBI's fifty-eight years of surveillance of Mr. Herndon. The answer is plainly "yes," there would be widespread and exceptional media coverage. So many questions emerge from NARA's description of the categories of FBI records that they are hard to catalogue. Here are some of the key questions. Reporters would want to

---

[1] NARA should be wary of looking to press accounts of important Black activists as a measure of the newsworthiness of their stories. Even the most famous and now-heralded Black leaders were subject to intense, and often illegal, surveillance by the FBI. Government officials often vilified Black activists, including Martin Luther King and Angelo Herndon, and Presidents pushed the FBI to continue surveillance. *See, e.g.*, Jonathan Eig & Jeanne Theoharis, *The Man Who Knew Exactly What the F B.I. Was Doing to Martin Luther King, Jr.*, N.Y. Times, Apr. 12, 2012 (explaining that President Lyndon Johnson pushed the FBI to maintain tight surveillance of Martin Luther King, Jr.) (available at https://www.nytimes.com/2023 04 12 opinion/lyndon-johnson-martin-luther-king-jr.html). Making matters worse, the FBI files of even the most important Black activists remain littered with redactions. Even the FBI's "vault" holding the FBI's records relating to the bureau's longstanding surveillance of Martin Luther King remains heavily redacted; it does, however, contain several references to Mr. Herndon. *See* https://vault.fbi.gov Martin%20Luther%20King%2C%20Jr.

know why the FBI surveilled Mr. Herndon for nearly six decades, even after Mr. Herndon had left the Communist Party and assumed a mundane life. Had the FBI maintained surveillance on other Black activists for nearly six decades? Reporters would also want to know why the FBI designated Mr. Herndon as a "treason" risk; an investigation that lasted nearly forty years. The same question would be asked of the FBI's designation that Mr. Herndon is a "security" risk; why that investigation lasted nearly 60 years, and what does that designation mean? Because the press would want answers to these and many other questions, there can be little doubt that there would be "widespread and exceptional" reporting on the FBI Herndon files.

To be clear, this is not just my view. Dr. Weimer's ruling cited a February 5, 2023, *Atlanta Journal-Constitution* front-page, multi-page, biography of Mr. Herndon, as the "largest media venue cited," but dismissed its importance because other newspapers had not replicated the *Journal-Constitution*'s coverage of Mr. Herndon.

Reporter and columnist Nedra Rhone, the author of the *Atlanta Journal-Constitution* article on Mr. Herndon, published a column challenging Dr. Weimer's conclusion about the newsworthiness of Mr. Herndon's FBI records.[2] Ms. Rhone points out that "Herndon, at age 19, arrived in Georgia as a labor organizer with the Communist Party. In 1932, he was arrested and charged under a state insurrection law for leading 1,000 Black and white workers in a march on the Fulton County courthouse, where they successfully and peacefully demanded financial assistance after the state had dropped 23,000 families from unemployment relief." Ms. Rhone went on to emphasize that mainstream journalism has largely ignored Black history, and that NARA, "the agency charged with preserving important records and materials involving the federal government does not believe the release of documents associated with the case that set the standard for these concerns should be considered urgent." To bring the Herndon story into contemporary politics, Ms. Rhone asks "How does Herndon's 58 years of surveillance compare with the Black Lives Matter activists who were also under FBI surveillance in recent years or the Jan. 6 insurrectionists who stormed the Capitol and may or may not under surveillance." Ms. Rhone ends her column by saying "Herndon's story is a long-forgotten piece of American History that deserves to be told in its entirety. There is no better time than the present to tell it."

In addition to Ms. Rhone, I consulted Adam Goldman, a *New York Times* reporter, and winner of multiple Pulitzer Prizes, who writes about the FBI. His conclusion is the same as Ms. Rhone's – namely, "that the FBI's files documenting fifty-eight years of surveillance of Angelo Herndon – contrary to the assertions of the National Archives – is extremely newsworthy." Mr. Goldman explains that the records would reveal "J. Edgar Hoover and the bureau's obsession with communists and Blacks activities long after they posed a security threat. It helps us understand the bureau's surveillance of Black civil rights activists, including the wiretapping, bugging, and harassment of Martin Luther King, Jr." Mr. Goldman points out that the issue of FBI overreach remains timely and newsworthy; noting that on April 12 the *New York Times* "published a column . . . revealing [President] Lyndon Johnson's encouragement of Hoover's wiretapping and recording of Dr. King."

---

[2] Attached to this letter are the *Atlanta Journal-Constitution* articles.

Mr. Goldman also explains why "[t]his story is bigger than Johnson and Hoover's surveillance of Dr. King and other prominent civil rights leaders."[1] He points out that the "FBI's surveillance of Angelo Herndon suggests that the bureau conducted treason and security investigations of Black activists long after they left public life. It raises troubling questions about how long and to what extent the bureau surveilled people because of their past political activities and begs the question of the current role of domestic spying in American democracy." After all, "Herndon left politics in the mid-to-late 1940s," but "Hoover and the FBI conducted security and treason investigations lasting until 1990 and amassed a 650-page file on him. The National Archives – in spite of the historical importance of Herndon's case and its relevance to both the Black Lives Matter movement and the January 6 insurrection – maintained that Herndon's FBI file is not newsworthy and therefore would take more than 39 months to process 650 pages of records."

Like Ms. Rhone, Mr. Goldman is "interested in reviewing Herndon's FBI files and disagree[s] with the National Archives' assessment of what is newsworthy. And as a reporter who routinely makes Freedom of Information requests, I believe that it will not take the Archives more than a week or two to review 650 pages for 'sources and methods' of surveillance." And Mr. Goldman agrees with Ms. Rhone about the newsworthiness of the records. He explains that the "press and the public will be keenly interested in why the FBI chose to spy on Angelo Herndon for five decades after he left public life, whether the surveillance of Herndon was part of a larger domestic spying operation of former communists and Black activities, and whether spying on current and former Black activities continues today."

Mr. Goldman's comments underscore that the Herndon files likely contain evidence of FBI overreach. This point is important because Criteria 4, which addresses "information sought [because it] involves possible questions about the government's integrity," is a basis for expedited review. Dr. Weimer acknowledged that I argued that the government's integrity is open to question given the FBI's marathon surveillance of Mr. Herndon, but she did not address that concern.

That concern that the FBI engaged in activities that question the "government's integrity" is evident from NARA's own description of the files. Questions about the "government's integrity" are embedded in nearly six decades of FBI surveillance; treason and national security investigations spanning decades; and ongoing surveillance even after Mr. Herndon left the playing field. The unfortunate fact is that the government has long resisted acknowledging its surveillance (legal or otherwise) of Black activists like Herndon, Martin Luther King,[4] and suspected communists, like Albert Einstein. Indeed, the most prominent publications relating to the FBI's surveillance of Black activists and communists, all begin with an explanation that the

---

[1] Mr. Goldman is referring to the *New York Times* article set out in footnote 1.

[4] https://kinginstitute.stanford.edu/king-papers/documents/j-raymond-henderson-2  The King papers at Stanford refer to Angelo Herndon on several occasions, mainly to provide legal support for Herndon while he was under indictment for inciting an insurrection.

information in the book came through FOIA litigation against the FBI.[5] NARA should not obstruct the release of important, non-exempt FBI files, especially where, as here, most of the records were generated the last century, and disclosure of these records could not lead to "foreseeable harm." 5 U.S.C. § 552(a)(8)(A)(i).

**Conclusion**

For the reasons set forth above and the reasons set out in my initial request for expedition, I urge NARA to process the Herndon FBI records forthwith, and enable me to include the interplay between Mr. Herndon and the FBI in my forthcoming biography of Mr. Herndon.

Respectfully submitted,

Brad Snyder
Anne Fleming Research Professor of Law
Georgetown University Law Center

cc:  Gary Stern, NARA General Counsel
     Dr. A. M. Weiner, Supervisory Archivist
     L'Shauntee J. Robertson, Assistant United States Attorney

---

[5] *See, e.g.*, Taylor Branch, *Parting of the Waters*, at xii (preface) & 923 (Macmillan, 1998); Jack Greenberg, *Crusaders in the Courts: How a Dedicated Band of Lawyers Fought for the Civil Rights Revolution* (Basic Books, 1994), and Fred Jerome, *The Einstein Files*, preface at xii (St. Martin's Press 2002) (pointing out that the FBI initially blacked out 300 pages; the redactions were lifted during FOIA litigation).

ANGELO HERNDON, A BLACK COMMUNIST,
DEFEATED GEORGIA'S INSURRECTION LAW

Nedra Rhone, February 5, 2023

Atlanta Journal Constitution



# Angelo Herndon, a Black communist, defeated Georgia's insurrection law



< Caption

Credit: Associated Pr

BLACK HISTORY MONTH 2023

By Nedra Rhone, The Atlanta Journal-Constitution

Feb 5, 2023

**Herndon was jailed for organizing march that got relief for starving families.**

*This story is one in a series of Black History Month stories that explores the role of resistance to oppression in the Black community.*

☰                                                            f  🗨  𝓟  ⬡  🖼  + 1

overthrow the lawfully and constituted authority of the state of Georgia," stood in front of a packed courtroom and delivered a social commentary that is eerily relatable today.

"The present system under which we are living today is on the verge of collapse; it has developed to its highest point and now it is beginning to shake," said Herndon.

Almost a century later, when more than 900 people have been charged in the Jan. 6 insurrection at the nation's capitol, Herndon's words still ring true. The systems we are living under have definitely begun to shake. In both cases, the defendants are charged under Civil War era insurrection laws, but that is where the similarities end.

Herndon, an avowed communist, had organized roughly 1,000 unemployed Black and white workers to march at the Fulton County Courthouse to demand financial assistance after the state dropped 23,000 families from the relief rolls during the Depression. Their peaceful protest was successful, but Herndon was later arrested and jailed. He was certain the all-white jury would sentence him to death.

Herndon would endure a five-year journey to justice as his case wound through Georgia Superior Court to the U.S. Supreme Court. This was international news, but even though Herndon prevailed, his story faded with time, a significant, if largely ignored, piece of American history.





"The Herndon case shows how the system of white supremacy in the South tried to suppress both Black and interracial activities to challenge the economic and political status quo. Legally, it gave rise to the revitalization and application of the clear and present danger test for laws restricting free speech," said Charles Martin, emeritus professor of history at University of Texas at El Paso and author of one of the few books written about Herndon.

During his time in prison, Herndon wrote his own story in an autobiography titled "Let Me Live" published by Random House in 1937 and reissued by the University of Michigan Press in 2007. He described his upbringing in a religious household in Wyoming, Ohio, and the death of his father, a coal miner, when Herndon was 9. When he left home at 13, Herndon went to work for coal mines in Kentucky and Alabama, where he soon found his voice as an organizer.

The Great Depression was setting in and Herndon saw workers losing jobs, losing pay and losing hope. Social movements including socialism, populism and radicalism had already been moving through the South, said Robin D. G. Kelley, professor of American history at the University of California Los Angeles, who has written extensively about social movements and Black radical thought. When the Communist party took off in the South in the 1930s, its core membership was Black people.

For Black Southerners, the idea that the means by which people live should be owned or run by the state or by the people was not foreign. Their brand of communism, often practiced beyond the eyes of the national leadership, infused elements of Christianity (meetings began with prayer) along with traditional teachings of equality for all.

"Black people transformed this thing seen as sinister. They made it their own," Kelley said. "They were fighting for basic civil rights and they were fighting fascism."

Atlanta was a primary center in the nation for the American Fascist Order of the Black Shirts, composed of 21,000 white jobless workers seduced by the rally cry "America for Americans!" Members were promised jobs that never materialized in return for violence against Black workers, wrote Herndon.

But disillusioned Black Shirts would soon decamp for the Communist party, and after repeated jail stints in Birmingham for organizing activities, Herndon moved on to Atlanta just in time to harness the growing frustrations of Black and white workers. He kept a low profile



The county agreed to hear the grievances of the people, and party members rushed to inform others that they should come to the courthouse for a demonstration. Herndon arrived early that morning, worried that none of the workers would show, but slowly the square began to fill until a thousand workers — half of them white, half of them Black, both men and women, some with children — stood shoulder to shoulder and demanded relief. Within 24 hours, county commissioners coughed up $6,000.

The march had been peaceful, but county officials were shaken. If this Black man from the North could rally a thousand Black and white people to successfully demand unemployment assistance, what else could he, or the Communist party, do?

"Interracial organizing was considered dangerous," Kelley said. White people felt they had one of two choices: view Black people as equals and allies and afford them the same wages and benefits or indulge white supremacy above all else, which dictated that Black people needed to be oppressed, killed or deported.

Herndon was arrested at the city post office and held in jail before he was indicted for attempting to overthrow the state government. The alleged insurrection was dated July 16, when Herndon was already behind bars.

He was charged under a dusty statute from 1883 initially intended to squash slave rebellions but later revised to apply to any insurrection against the state. Anyone convicted of circulating insurrectionist materials, attempting insurrection or inciting others to do so could receive five to 20 years in prison or face the death penalty. Only two people were ever convicted under this statute, a Black preacher in 1868 and Herndon.

Herndon's case was devoid of the sexual dynamics that usually accompanied criminalization of Black men such as the Scottsboro Nine, the Black males ages 13 to 20 accused in Alabama of raping two white women in 1931. Testimony in Herndon's case centered on Communist ideals, which Southern segregationists cast as a tool for racial equality that would disrupt societal order with interracial marriage.

With little evidence of insurrection, state prosecutors hung their case on Herndon's engagement with the Communist party. The International Labor Defense (ILD) contracted Atlanta attorneys Benjamin J. Davis Jr. and John H. Geer to represent Herndon as the state



Officials raided Herndon's home and produced Communist party materials including books, pamphlets, and receipt pads for party membership. In court, professors from Emory University testified that the materials could be obtained by any library patron.

After a short trial in Fulton County Superior Court, Herndon was found guilty and sentenced to 18 to 20 years on the chain gang. His attorneys appealed but Georgia Supreme Court upheld the conviction in 1934 and a year later, the U.S. Supreme Court ruled 6-3 against Herndon and sent the case back to lower courts.

A few months later, the U.S. Supreme Court denied a re-hearing, but Herndon caught a break when Judge Hugh Mason Dorsey, a former governor, took the bench of Georgia's Appeals Court and found the outdated insurrection laws were too vague. The state Supreme Court upheld the original conviction, but when Herndon's case was sent back to U.S. Supreme Court, justices overruled the Georgia Court in a vote of 5 to 4.

Angelo Herndon defeated Georgia's insurrection law                    https: www.ajc.com/life angelo-herndon-defeated-georgias-insurrect .





landscape for white liberals who had previously been dismissive of civil liberties for Black Americans. "If you were a white liberal in the South, you were a segregationist, but this case forced a lot of people off the fence," Kelley said. "Suddenly you get academics and progressives coming to testify, saying we have gone too far, you cannot execute someone for holding literature that anyone can get in the library."

Now a free man, Herndon married Joyce Chellis in 1938, and though he had resolved to return to Georgia, he never did. He moved back to the Midwest and worked as a salesman before his death in 1997.

For a time after his release, he worked in various capacities for the Communist party before parting ways, as did many Southern Black people during the Cold War when party leaders thought it best to downplay allegiance to Black equality in America.

"The Cold War erasure has affected our ability right now in 2023 to understand how important the Communist party was in the longer trajectory of the civil rights movement," Kelley said.

Young Black people, moved by Herndon's case would form the Southern Negro Youth Congress, the predecessor of the youth movement that sparked the civil rights movement.

Black communists had considered themselves part of an international movement for justice, Kelley said. They recognized intersectionality before the term was ever used, embracing the Black poor, the Black working-class and Black women.

"The party built leaders out of people who were told they could not lead," Kelley said. "What the Communist party represented was not just anger at injustice but an analysis of how society works."

They were small in number, but Southern communists had outsized ideals of what American society could and should be, and Herndon was a leader among them.

*For more subscriber exclusives on the African American people, places and organizations that have changed the world, go to ajc com/black-history-month.*

## About the Author

OPINION: WHAT COULD 58 YEARS OF FBI
SURVEILLANCE OF ACTIVIST TELL US?

Nedra Rhone, February 5, 2023

Atlanta Journal-Constitution



# OPINION: What could 58 years of FBI surveillance of activist tell us?



‹ Caption

Credit. Associated Pr

REAL LIFE WITH NEDRA RHONE

By Nedra Rhone, The Atlanta Journal-Constitution

April 21, 2023

### Records related to 1930s Georgia civil liberties figure currently unavailable for review

Each year in February, when The Atlanta Journal-Constitution produces a monthlong series on Black history, I challenge myself by writing about something or someone I know nothing about.

≡                                                              f    ☺    ℗    ☺    ✉

Black men in the country during a five-year court battle that had a profound impact on American civil liberties.

Herndon, at age 19, arrived in Georgia as a labor organizer with the Communist Party. In 1932, he was arrested and charged under a state insurrection law for leading 1,000 Black and white workers in a march on the Fulton County courthouse, where they successfully and peacefully demanded financial assistance after the state had dropped 23,000 families from unemployment relief.

Herndon would bounce between state courts and the U.S. Supreme Court, engaging a who's who of legal and political heavyweights, all in support of a case that would lay the groundwork for the protections of free speech and peaceful assembly that we enjoy today.

Explore   Angelo Herndon, a Black communist, defeated Georgia's insurrection law

But for someone who had gained international fame, documentation of Herndon's life and his work was difficult to find. A few weeks ago, when I received an email from a professor at Georgetown University, I learned I wasn't the only one desperately seeking Herndon.

David Vladeck handles cases involving access to government records, and he is representing his colleague Brad Snyder, a legal historian, who is under contract to write a biography of Herndon.

Under the Freedom of Information Act, Snyder had requested all records relating to Herndon from the FBI and then from the National Archives and Records Administration (NARA) in May 2022.

It took six months for NARA to search for the records, which include a total of almost 700 pages of FBI surveillance that spanned nearly 60 years of Herndon's life.

The records include a treason investigation from 1934 to 1974, a domestic security investigation from 1946 and 1990, and a domestic security investigation in Washington, D.C., from April to July 1968.

≡                                                                      f  ♈  𝓟  ⛶  ✉ 

Arkansas.

Only during the last seven years of his life did the federal government decide he was no longer an enemy of the state.

"Why was Herndon subject to surveillance even after he backed away from activism and politics?" asked Vladeck in a letter to NARA.

It's a good question, but as it stands, we won't be able to read the answer in Snyder's forthcoming book.

NARA has determined that it will take four years to process the documents on Herndon, long after Snyder's book is due. Agency officials rejected Vladeck's requests to expedite the records, on the grounds that there is no urgent need to inform the public of government activities and that the topic is not of widespread media interest.

We are living in a moment when it feels as if our civil liberties are under attack. It is a moment when an actual insurrection has occurred. But the agency charged with preserving important records and materials involving the federal government does not believe the release of documents associated with a case that set the standard for these concerns should be considered urgent.

Would we not gain some insight into the present by understanding more about Herndon's history?

In 2018, Rebecca Wu, a spokeswoman for the FBI in St. Louis, told the Intercept that the FBI does not engage in surveillance of individuals who are exercising their First Amendment rights but the FBI does review intelligence that indicates an individual might be involved in criminal activity or pose a threat to national security.

How does Herndon's 58 years of FBI surveillance compare to the Black Lives Matter activists who were also under FBI surveillance in recent years or the Jan. 6 insurrectionists who stormed the Capitol and may or may not be under surveillance?

"This is a story about our democracy. Can we protest what is happening with our state and country and not be thrown in prison?" said Snyder when we talked by phone. The records

≡                                                    f   ⌣   ☺   ♺   ▨

Snyder said he was drawn to Herndon's story in part because it represents an important moment in time when the Supreme Court was focused on protecting our civil liberties.

"I am writing for people who want to know how we received basic protections of free speech and how we protected the right to peacefully protest. Herndon's case is an important building block to protect that constitutional right," he said.

Herndon's story is a long-forgotten piece of American history that deserves to be told in its entirety.

There is no better time than the present to tell it.

*Read more on the Real Life blog (www ajc com/opinion/real-life-blog) and find Nedra on Facebook (www facebook com/AJCRealLifeColumn) and Twitter (@nrhoneajc) or email her at nedra rhone@ajc com.*

## About the Author

 **Nedra Rhone**                                            𝕐

Nedra Rhone is a lifestyle columnist for the Atlanta Journal-Constitution where she has been a reporter since 2006. A graduate of Columbia University School of Journalism, she enjoys writing about the people, places and events that define metro Atlanta.

## Editors' Picks

STATEMENT OF ADAM GOLDMAN

MARCH 5, 2023

REPORTER, NEW YORK TIMES

### Statement of Adam Goldman

### Re: Newsworthiness of Angelo Herndon's FBI Files

I am a *New York Times* reporter who writes about the Federal Bureau of Investigation (FBI). In 2018, I was part of a team of reporters who won the Pulitzer Prize for national reporting on Russia's meddling in the 2020 presidential election. Six years earlier with the Associated Press, I was part of a team of reporters who won the Pulitzer Prize for investigative reporting on the New York Police Department's secret spying unit of Muslim-Americans. I co-authored the 2013 book, "Enemies Within: Inside the NYPD's Secret Spying Unit and bin Laden's Final Plot Against America."

I believe that the FBI's files documenting fifty-eight years of surveillance of Angelo Herndon – contrary to the assertions of the National Archives – is extremely newsworthy. It reveals J. Edgar Hoover and the bureau's obsession with communists and Black activists long after they posed security threats. It helps us understand the bureau's surveillance of Black civil rights activists including the wiretapping, bugging, and harassment of Martin Luther King, Jr. There is still so much we do not know. On April 12, the *Times* published a column by historians Jonathan Eig and Jeanne Theoharis revealing Lyndon Johnson's encouragement of Hoover's wiretapping and recording of Dr. King.

This story is bigger than Johnson and Hoover's surveillance of Dr. King and other prominent civil rights leaders. The FBI's surveillance of Angelo Herndon suggests that the bureau conducted treason and security investigations of Black activists long after they left public life. It raises troubling questions about how long and to what extent the bureau surveilled people because of their past political activities and begs the question of the current role of domestic spying in American democracy. As Nedra Rhone wrote on April 21 in her *Atlanta Journal-Constitution* column about Herndon, the FBI's St. Louis office claimed that Black Lives Matter activists were not surveilled unless they posed security threats. That does not seem to be the case with Angelo Herndon.

During the depths of the Great Depression in July 1932, the 19-year-old Herndon was arrested at an Atlanta post office. Ten days earlier, he had led a peaceful demonstration of 150 unemployed white and Black workers at the Fulton County Courthouse to protest the county's attempt to cut 23,000 people from the relief rolls. Held incommunicado for eleven days after his arrest, Herndon was charged under a former Georgia slave insurrection law with "attempting to incite insurrection" – a capital crime punishable by death. During a two-day trial in early 1933, Herndon was tried and convicted by an all-white jury and sentenced to 18 to 20 years on a chain gang. The Supreme Court heard Herndon's case twice – once in 1935 when it ruled 6-3 that Herndon's lawyers had failed to properly raise First Amendment objections to the Georgia law and again in 1937 when it ruled 5-4 in Herndon's favor on free speech and assembly grounds. *Herndon v. Lowry* distinguished between an unlawful attempt to incite imminent violence and the right to peacefully protest. After his conviction was overturned, Herndon transformed himself into a Harlem literary star who published an autobiography with Random House; befriended Richard Wright while writing for the *Daily Worker*; and edited the *Negro Quarterly* with Ralph Ellison. In 1944, Herndon split with the Communist Party. He died in 1997 in obscurity.

Even though Herndon left politics in the mid-to-late 1940s, Hoover and the FBI conducted domestic security and treason investigations lasting until 1990 and amassed a 650-page file on him. The National Archives – in spite of the historical importance of Herndon's case and its relevance to both the Black Lives Matter movement and the January 6 insurrection – maintained that Herndon's FBI file is not newsworthy and therefore would take more than 39 months to process 650 pages of records.

As a reporter who covers the FBI for the *New York Times* and who has won a Pulitzer Prize for writing about a domestic spying operation on a minority group, I am interested in reviewing Herndon's FBI files and disagree with the National Archives' assessment of what is newsworthy. And as a reporter who routinely makes Freedom of Information Act requests, I believe it will take the Archives no more than a week or two to review 650 pages for "sources and methods" of surveillance. The press and the public will be keenly interested in why the FBI chose to spy on Angelo Herndon for five decades after he left public life, whether the surveillance of Herndon was part of a larger domestic spying operation of former communists and Black activists, and whether spying on current and former Black activists continues today.

Signed

Date    5/5/23